**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

|  |  |  |
|---|---|---|
| In re: | : | CHAPTER 11 |
| HERMITAGE INN REAL ESTATE HOLDING COMPANY, LLC | : | CASE NO. 19-20903 (JJT) |
| Debtor. | : |  |

|  |  |  |
|---|---|---|
| In re: | : | CHAPTER 11 |
| HERMITAGE CLUB, LLC | : | CASE NO. 19-20904 (JJT) |
| Debtor. | : |  |

**DECLARATION OF JAMES R. BARNES IN SUPPORT OF**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, James R. Barnes, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a Founding Member and Manager of Hermitage Inn Real Estate Holding Company, LLC ("HIREHCO") and I am the manager of Hermitage Club, LLC (the "Club"), the wholly owned subsidiary of HIREHCO (together, the "Debtors," or the "Company").

2. I was the first and only founding member of HIREHCO at its formation in December, 2007. I am familiar with the Company's business and financial affairs. I have been responsible, for, among other things, devising and implementing strategies for the Company, including, *inter alia*, (i) understanding and shaping the business and financial affairs of the Company; (ii) assessing the current liquidity position of the Company; (iii) exploring various restructuring strategies for the Company; and (iv) serving as a contact with the Company's creditors, members and vendors. I am familiar with the Company's books and records, and I have

acquired extensive knowledge of the Company and its day-to-day operations and business affairs, including its assets, liabilities, historical operations, and future plans.

3. I submit this declaration (the "Declaration") in support of the voluntary petitions for relief for the Debtors' cases (together, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the motions and applications for related relief filed as of the date hereof (the "Petition Date") or concurrently herewith (collectively, the "First Day Pleadings").

4. I have reviewed the First Day Pleadings or have otherwise had their contents explained to me and, to the best of my knowledge and insofar as I have been able to ascertain after reasonable inquiry, I believe that approval of the relief requested therein is necessary to minimize disruption to the Debtors' business operations, permit an effective transition into chapter 11, and preserve and maximize the value of the Debtors' estates.

5. I also believe that absent access to financing and otherwise maintain business operations as described in greater detail in the First Day Pleadings, the Debtors would suffer immediate harm to the detriment of their estates, creditors, and other stakeholders.

6. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of the Debtors' business operations, my review of relevant documents, information provided to me or verified by employees or the Debtors' professional advisors, and/or my opinion based upon my experience, and/or knowledge and information concerning the Debtors' financial records and the private resort industry generally. Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.

7. I am authorized to submit this Declaration on behalf of the Debtors and, if called upon, I would testify competently to the facts set forth herein.

**Preliminary Statement**

8. The Debtors own a four-season private members only resort located in Wilmington and Dover, Vermont ("Hermitage" or the "Resort"). The Resort is Vermont's only private ski and golf resort.

9. HIREHCO, a Connecticut limited liability company, was formed in 2007 to purchase the Hermitage Inn (the "Inn") in West Dover, Vermont. In 2011, HIREHCO expanded its operations and purchased the nearby Haystack Mountain ski resort and an adjacent 18-hole Desmond Muirhead designed championship golf course. The Club, also a Connecticut limited liability company, was organized at that time with the intent to develop the Resort into a private, members only facility with 450 private homes and condominiums to be built on site.

10. Development of the project commenced and ski lifts were installed to link the Inn to the ski mountain. Two new quad chairlifts were installed as well as a state of the art high-speed Barnstomer chairlift. A beautiful clubhouse facility was opened in 2014. Club memberships were being sold at an even pace to achieve the goal of 1,500 members and 450 residential properties on site.

11. As the Company operations continued to grow, the Debtors purchased additional inns in the area to support the membership sales process, including the Snow Goose Inn, The White House Inn, and the Inn at Sawmill Farm[1] ,which were open to the public, and acquired Nordic Hills Lodge, Horizon Inn, Doveberry Inn for employee housing.

12. In 2013, HIREHCO acquired the Deerfield Valley Airport property (the "Airport Property") and an additional 450 acres for building lots and expansion of the existing runway.

---

[1] The White House Inn was transferred to Robert Grinold by deed-in-lieu of foreclosure in August 2018. The Inn at Sawmill Farm was foreclosed and sold at auction in June 2018.

The Airport Property would make the Resort easily accessible to members traveling from New York, Boston and other metropolitan areas.

13. The purchase of the Airport Property proved to be troublesome for the Debtors. The State of Vermont Department of Natural Resources took the position that the common ownership of the Resort and the Airport Property through HIREHCO allowed it to re-evaluate permits already issued by the State. The State of Vermont halted the existing permits as it evaluated impact on area natural resources. The sale of lots and club memberships decreased dramatically. Because of the financial distress caused by the declining sale of memberships and real estate, it became necessary, in 2016, to sell the Airport Property and additional acreage in order to maintain operations and narrow the permitting focus on the original ski area parcel.

14. A continued decline in membership and real estate sales resulted in, *inter alia*, a default in payment of sales and use taxes owed to the State of Vermont. On April 1, 2018, the State of Vermont ordered the closure of the Resort due to the non-payment of taxes. Subsequently, Debtors' senior lender, Berkshire Bank, commenced a foreclosure action against the Debtors in the Vermont State Courts (the "Berkshire Foreclosure Action"). By order of the court in the Berkshire Foreclosure Action, a receiver (the "Receiver") was appointed to take possession and maintain the Debtor's real and personal property subject to the action (the "Property"). The Receiver has maintained and preserved the Property but has not sought to re-open or improve the facilities since its appointment. The Receiver retained approximately five employees to maintain the Property.

15. In addition, RCN Capital Advisors, LLC ("RCN") commenced a foreclosure action seeking to foreclose its interest in a mortgage covering certain properties owned by the Debtors.

In April, 2019, RCN took title to the HIREHCO properties located at 18 Haystack Mountain Lane and 38 Stag's Leap in Wilmington, Vermont.

16. The Company is confident that given its state of the art facilities and favorable geographical proximity to millions of potential members, the Company can use the Chapter 11 Cases to successfully gain access to the additional capital and liquidity necessary to reopen and continue to upgrade the Resort and its facilities, reassure and expand its membership base, restructure its balance sheet and negotiate the terms of a plan of reorganization.

## PART I
## Background

A.  Company Organization and Structure

17. HIREHCO owns all of the real property at the Resort, while the Club is a wholly owned subsidiary of HIREHCO which operates the Resort, has more than five hundred members, and owns personal property related to the Resort operations. HIREHCO also owns Hermitage Inn, LLC, a Vermont LLC, which owns personal property maintained at the Inn and the Snow Goose Inn. In addition, HIREHCO owns a fifty percent (50%) interest in Hermitage Deerfield Valley Real Estate, LLC, a Vermont real estate brokerage firm.

B.  The Debtor's Prepetition Debt Structure

    (i)  Prepetition Senior Credit Documents

18. HIREHCO, as borrower, is a party to a construction loan agreement and related documents dated September 30, 2013 pursuant to which Berkshire Bank ("Berkshire" or the "Prepetition Senior Lender") extended a secured financing facility to HIREHCO in the original principal sum of $20,000,000, as evidenced by a certain Second Amended and Restated Promissory Note in the original principal amount of $15,000,000 (the "Base Lodge Note"); as further evidenced by that certain Third Amended and Restated Promissory Note dated June 28,

5

2016 in the original principal amount of $1,000,000 (the "Bridge Loan Note") and as further evidenced by that certain Promissory Note dated as of July 18, 2017 in the original principal amount of $1,100,000 (the "Second Bridge Loan Note"), all as secured by a Construction Mortgage and Security Agreement dated September 30, 2013 (the "Construction Mortgage") and recorded in the Town of Wilmington and the Town of Dover Land Records on real property owned by HIREHCO and located in the Towns of Wilmington and Dover, as more specifically described on Schedule A attached hereto (the "Real Property"), as amended by Amendment of Mortgage dated April 30, 2014 and as further amended by Second Amendment of Mortgage dated November 12, 2014 and as further amended by Third Amendment of Mortgage dated December 3, 2014 and as further amended by Fourth Amendment of Mortgage dated December 4, 2015 and as further amended by Fifth Amendment of Mortgage dated June 28, 2016 and as further amended by Sixth Amendment of Mortgage dated February 1, 2017 and as further amended by Sixth Amendment of Mortgage dated February 1, 2017 and as further amended by Seventh Amendment of Mortgage dated February 10, 2017 and as further amended by Eighth Amendment of Mortgage dated July 18, 2017 (the Base Lodge Note, the Bridge Loan Note, the Second Bridge Loan Note, and together with the Construction Mortgage, as amended, the "Berkshire Loan Facility").

19. A portion of the real property secured by the Berkshire Loan Facility is leased by HIREHCO from the Town of Wilmington and the Wilmington Water District. The Town of Wilmington and the Wilmington Water District, as Landlord under the ground lease with HIREHCO entered into a certain Ground Lease Consent and Recognition Agreement dated March 9, 2015 and recorded in the Wilmington Land Records consenting to the Berkshire Loan Facility.

20. The Club and HIREHCO granted to Berkshire a security interest in all of their respective personal property to secure the indebtedness under the Berkshire Loan Facility by Security Agreements each dated September 30, 2013. In order to perfect the security interests, Berkshire filed UCC financing statements with the Connecticut Secretary of State (the "Security Interests").

21. On December 3, 2014, HIREHCO, the Club and James R. Barnes entered into a Second Amended and Restated Construction Loan Agreement, as amended by First Amendment of Loan Agreement and Other Loan Documents dated June 28, 2016, Second Amendment of Loan Agreement and Other Loan Documents dated February 10, 2017, Third Amendment of Loan Agreement and other Loan Documents dated June 14, 2017 and Fourth Amendment of Loan Agreement and Other Loan Documents dated July 18, 2017 to secure the Berkshire Loan Facility.

22. Berkshire declared a default under the Berkshire Loan Facility and the parties entered a certain Forbearance Agreement dated December 30, 2016 as amended by Second Amendment to Forbearance Agreement dated July 18, 2017 and as further amended by Amended and Restated Forbearance Agreement dated November 30, 2017.

23. In March, 2018, the State of Vermont issued a closure notice to the Club for non-payment of sales and use taxes in excess of $1 million forcing it to cease operations effective immediately.

24. As of the Petition Date, the Debtors have aggregate secured obligations of more than $30 million including approximately $19 million owed to Berkshire. Moreover, the Debtors have unsecured trade debts totaling approximately $4.5 million, which include amounts owing for utilities, maintenance, professional fees, marketing, and employee-related expenses. In addition,

the Debtors have sold approximately $60 million of memberships to more than five hundred members. The Debtors' assets have been valued in excess of $50 million.

## PART II
## Events Leading to the Debtors' Chapter 11 Cases

A.     Restructuring Efforts

25.     The Company filed its Chapter 11 Cases in response to the pending Berkshire Foreclosure Action, the RCN Foreclosure Action and the closure of the Club operations by the State of Vermont taxing authority.[2]

26.     Despite the fact that the Company has a significant number of loyal members and a luxury four-season private members ski and golf resort, the losses associated with the Company's inability to continue to develop the residential housing planned for the Resort created an expense burden that could not be supported.

27.     Prior to their bankruptcy filings, the Debtors engaged in several unsuccessful efforts to obtain new financing to enable the Club to reopen.[3] The Debtors recognize that to preserve the value of the Club and their assets, the Club operations need to be reopened as quickly as possible. As a result, the Debtors determined that chapter 11 filings at this time was necessary to provide the Company with the best opportunity to restart operations before another winter season.

B.     Need for Postpetition Financing

28.     The Debtors require, on an immediate basis, liquidity to maintain the Debtors' assets, maximize value of the Resort, and implement restructuring initiatives. Simultaneously

---

[2] On May 22, 2019, an involuntary bankruptcy petition was filed by three petitioners in the United States Bankruptcy Court, District of Vermont, Case No. 19-10214 against HIREHCO.

[3] As part of these efforts, appraisals were conducted of Debtors' real estate assets including an appraisal dated November 30, 2018 valuing the "as is" market value of the Debtors' real estate assets at $50 million.

herewith, the Debtors have filed an application seeking authority to enter into a debtor-in-possession financing facility ("DIP Financing") with Restructured Opportunity Investors, Inc. (the "DIP Lender"). Berkshire has not been willing to extend any debtor-in-possession financing to the Debtors and has not consented to the terms of the DIP Financing. The DIP Lender has, however, made a superpriority lien position a condition of the DIP Financing. The Debtors believe that Berkshire's interest is adequately protected through its substantial equity cushion in the collateral. The DIP Financing will enable the Company to maximize the value of the Debtors' assets and properties, and maintain their businesses through a restructuring.

## PART III
## First Day Matters

A.   <u>Relief Sought in the First Day Pleadings</u>

29.   It is critically important for the Debtors to maintain the goodwill of, among other constituencies, their members and vendors. Achieving this goal is likely to be challenging while working to restructure their businesses in chapter 11. To that end, the Debtors have filed the First Day Pleadings seeking relief intended to allow the Debtors to effectively transition into chapter 11 and allow the Company to maintain its assets, thereby preserving and maximizing the value of the Debtors' estates. Unless the relief requested is granted, I believe the Debtors' business operations will suffer significant adverse consequences.

30.   I have reviewed each of the First Day Pleadings. The facts stated therein and described below are true and correct to the best of my knowledge, information and belief, I believe that the relief sought in the First Day Pleadings is critical and necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations, and constitutes a critical element in successfully restructuring the Debtors' business. A brief summary of the relief sought in each of the First Day Pleadings is as follows:

B.    <u>Administrative Motions</u>

    (i)    Motion for an Order Directing Joint Administration of the Debtor's Chapter 11 Cases (the "Joint Administration Motion").

31.    The Debtors request entry of an order pursuant to section 105(a) of the Bankruptcy Code, Bankruptcy Rule 1015(b), and Local Bankruptcy Rule 1015(b)-1 directing joint administration of the Chapter 11 Cases for procedural purposes only. Further, the Debtors request that an entry be made on the docket of each of the Chapter 11 Cases to indicate the joint administration of the Chapter 11 Cases.

32.    Given the integrated nature of the Debtors' businesses, joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party-in-interest. Many of the motions, hearings, and orders that will be filed in the Chapter 11 Cases will almost certainly affect each of the Debtors. The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties-in-interest to monitor the Chapter 11 Cases with greater ease and efficiency.

33.    I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be granted.

    (ii)    Debtors' Motion for an Order Extending the Time to File Schedules of Assets and Liabilities and States of Financial Affairs (the "Schedules and Statements Motion")

34.    The Debtors request entry of an order granting a 20-day extension of the time to file their schedules of assets and liabilities and statements of financial affairs (collectively, the "<u>Schedules and Statements</u>") for a total of 34 days after the Petition Date. The Debtors' business operations require the Debtors to maintain voluminous books and records. Given the size of the

Debtors' operations with more than five hundred members and approximately one thousand creditors, I submit that the large amount of information that must be assembled to prepare the Schedules and Statements would be unnecessarily burdensome to the Debtors during the first 14 days following the Petition Date. The Debtors are sensitive to the need to complete the Schedules and Statements as soon as possible, and they intend to complete the Schedules and Statements before the proposed 34-day deadline, if possible.

35. I believe that the relief requested in the Schedules and Statements Motion is in the best interests of the Debtors' estates, creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules and Statements Motion should be granted.

C. <u>Operational Motions</u>

36. The Debtors intend to ask for relief with respect to the following First Day Pleadings that directly impact the Debtors' ability to maintain their businesses and manage their properties.

(iii) *Debtors' Motion to (i) Obtain Post-Petition Financing and (ii) Granting Liens and Superpriority Claim Status to the DIP Lender*

37. The Debtors require, on an immediate basis, liquidity to implement their restructuring initiatives. The Debtors' will be filing a motion to seek authority to enter into a $1,750,000 DIP Financing (defined below) with Restructured Opportunity Investors, Inc. (the "DIP Lender") pursuant to the terms of that certain DIP Commitment Letter dated as of May 9, 2019 (the "DIP Commitment Letter"). The Company believes that the proposed DIP Financing presents the best financing option available under the circumstances. The DIP Financing is fair and reasonable and will enable the Company to maximize the value of the Debtors' businesses

and properties, and maintain their businesses through this chapter 11 process.

38. Subject to Court approval, the Debtors have negotiated and executed the DIP Commitment Letter evidencing the DIP Lender's commitment to deliver a secured, superpriority postpetition credit facility in the aggregate amount of up to $1.75 million (the "DIP Loan") pursuant to the terms of the agreements to be executed by and between the parties (the "DIP Financing" or the "DIP Facility"). Since the Debtors have not been operating the Club since March, 2018, there is little cash on hand as of the Petition Date. In order to prepare and maintain the Club and the Resort facilities for the upcoming winter ski season, preserve and maintain the Debtors' going concern value and, ultimately, effectuate a successful reorganization, the Debtors require use of the DIP Facility. As set forth in more detail in the DIP Financing Motion, access to the DIP Facility (as defined in the DIP Financing Motion) are critical to the Debtors' ability to continue to operate through these Chapter 11 Cases and to permit the Debtors to maximize value for the benefit of their stakeholders.

39. After pursuing other avenues for funding their continuing operations, the Debtors have determined that the DIP Facility with the DIP Lender is the best financing option available to them. The financing provided under the DIP Facility is the aggregate amount of $1.75 million The stated maturity of the financing is the earlier of (i) six months or a final order confirming Debtors' plan of reorganization. The financing will be secured by a first priority mortgage position and assignment of rents on all real property owned by the Debtors and a first priority security interest in Debtors' personal property assets, including all membership dues and receivables.

40. The DIP Facility will provide the Debtors the liquidity necessary to operate through a plan of reorganization. Approval of the DIP Facility will permit the Debtors to maintain

their business and satisfy critical financing obligations during the Chapter 11 Cases.

41. As set forth in the DIP Financing Motion, the Debtors' execution of the DIP Facility agreements is an exercise of their sound business judgment that warrants approval by the Court. Prior to the Petition Date, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs during the pendency of the Chapter 11 Cases. Based on such analysis, the Debtors determined that post-petition financing was necessary to support their operational and restructuring activities.

42. After a series of good faith, arm's-length negotiations, the Debtors and the DIP Lender entered into the DIP Commitment Letter, which sets forth the material terms of the DIP Facility. The Debtors have determined in their sound business judgment that the DIP Facility provides a greater amount of financing on more favorable terms than any other reasonably available alternative.

43. The Debtors have pursued various sources to find parties interested in extending debtor-in-possession financing. For a number of reasons, however, none of the lenders contacted were willing or available to provide financing to the Debtors on terms acceptable to the Debtors, including the amount and in the time frame required to address the Debtors' urgent liquidity needs.

44. The Debtors' ability to finance their operations and the availability of sufficient working capital and liquidity are vital to preserve and maintain the Debtors' going-concern value and maximize the value of the Debtors' estates for the benefit of all creditors. As discussed in detail in the DIP Financing Motion, the Debtors require immediate access to financing in order to meet the needs in connection with the Chapter 11 Cases.

45. For the foregoing reasons, I believe that the terms and conditions of the DIP Facility are fair, reasonable, and negotiated in good faith and at arms' length after reasonable

efforts to obtain the most advantageous post-petition financing. The Debtors have determined, in their reasonable business judgment, that the DIP Facility is the best financing option available under the present circumstances. I further believe that the relief requested in the DIP Financing Motion is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable to the Debtors to maintain their businesses in chapter 11 without disruption. On behalf of the Debtors, I respectfully submit that the Court should approve immediate access to the DIP Facility.

D.   Conclusion

46.   The relief sought in each of the First Day Pleadings will minimize the adverse effects of the Chapter 11 Cases on the Debtors and result in maximum creditor recoveries. I believe that the relief sought in each First Day Pleading is necessary to enable the Debtors to operate effectively as debtors-in-possession.

47.   Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each First Day Pleading be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ____ day of May, 2019.

_____
James R. Barnes